AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| JAIME ALVAREZ | ) | |
| | ) | |
| *Defendant(s)* | ) | |

**FILED**

May 11, 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

2:22-mj-0072 DB

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ December 8, 2021 _____ in the county of _____ Solano _____ in the
_____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm |

This criminal complaint is based on these facts:

See attached affidavit of TFO Shane Raftery

☒ Continued on the attached sheet.

_____ /s/Shane Raftery _____
*Complainant's signature*

_____ Shane Raftery, FBI TFO _____
*Printed name and title*

Sworn to me and signed via telephone.

Date: _____ May 11, 2022 _____

City and state: _____ Sacramento, California _____

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

## Affidavit in Support of Criminal Complaints

I, Shane Raftery of the Fairfield Police Department and deputized federal task force officer, being duly sworn, depose and state as follows:

## Background and Expertise

1. I have been a police officer with the Fairfield Police Department since March 2013. I am currently a Detective with the Fairfield Police Department, and I am assigned as a Task Force Officer ("TFO") with the FBI Solano County Violent Crime Task Force. I have been a member of the task force since January 2021. In this role, I am responsible for investigating a variety of criminal matters, including firearms violations, kidnappings, bank robberies, fugitive investigations, and violent criminal enterprises such as street gangs and organized crime.

2. During my time as a Detective with the Fairfield Police Department's Special Operations Team, my duties included the investigation of street level crimes, including known and potential gang related crimes, which occurred in the city of Fairfield or in which occurred in an outside jurisdiction, where an involved party is either associated to, or a member of a gang in Fairfield. In addition, my partners and I conducted routine patrols of gang related areas and/or territories, including high crime areas, where gang members and their affiliates are known to live, congregate, socialize and/or commit crimes. My duties also include the tracking of gangs, gang members, and/or gang associates, including their activities, within Fairfield and its surrounding areas.

3. During the course of my career, I have personally contacted numerous known, self-admitted and/or suspected gang members, and/or gang associates, in both custodial and noncustodial settings. I have also contacted numerous civilians who reside, frequent, and/or work in high crime areas/gang related territories, who have personal knowledge of these particular gangs, their operations, and/or their members and/or associates. These contacts have resulted in numerous arrests, gang related field documentations, information gathering, and also the developing/building of rapport with known and/or suspected gang members and their associates. These contacts have also resulted in me being personally educated by gang members and/or gang associates, regarding a given gang's allies, enemies/rivals, hand signs, locations and/or claimed territories, their activities and also their histories.

4. I have also assisted in and personally lead gang related investigations, ranging from vandalism to murder. My duties have also included meeting with and/or working alongside the Solano County District Attorney's Office to discuss new/updated gang laws, writing gang validation reports, gang related search warrants, and also the writing of gang enhancements for cases which have occurred in the city of Fairfield, California.

5.  I have received formalized gang related training through the ICI – Basic and Advanced Gang Investigators Courses, the California Gang Investigators Association weeklong conferences, the Solano County Gang/STG intelligence sharing meetings, and also through numerous additional POST and non-POST related trainings.  I have also spoken with and received training from current and former gang detectives and have also spoken with officers who have personally dealt with/contacted members and/or associates of the Hells Angels Motorcycle Club ("HAMC").  I have also personally spoken with current and former HAMC members and associates, including those in "good" and "bad" standing.

6.  I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

### Purpose of Affidavit

7.  This affidavit requests that criminal complaints and arrest warrants be issued for the following individuals:

   a.  Vallejo HAMC member Michael Mahoney ("MAHONEY") for violations of 18 U.S.C. § 922(k) (possession of a firearm with an obliterated serial number) and 26 U.S.C. § 5861(d) (possession of an unregistered short-barreled shotgun and silencer);

   b.  Vallejo HAMC member Jaime Alvarez ("ALVAREZ") for violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm);

   c.  Vallejo HAMC member Dennis Killough, Jr. ("KILLOUGH") for violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm); and

   d.  Vallejo HAMC member Kenneth Caspers, Jr. ("CASPERS") for violations of 18 U.S.C. § 922(g)(1) (felon in possession of ammunition) and 26 U.S.C. § 5861(d) (possession of an unregistered silencer).

8.  I know based on my training and experience and conversations with other law enforcement officers that the elements of a violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and/or ammunition) are as follows:

   a.  First, the subject knowingly possessed a firearm and/or ammunition;

   b.  Second, the firearm and/or ammunition had been shipped or transported in interstate or foreign commerce;

    c. Third, at the time the subject possessed the firearm and/or ammunition, the subject had been convicted of a crime punishable by imprisonment for a term exceeding one year; and

    d. Fourth, at the time the subject possessed the firearm and/or ammunition, the subject knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year.

9. I know based on my training and experience and conversations with other law enforcement officers that the elements of a violation of 18 U.S.C. § 922(k) (possession of a firearm with an obliterated serial number) are as follows:

    a. First, the subject knowingly possessed a firearm;

    b. Second, the firearm had the importer's or manufacturer's serial number removed, obliterated, or altered;

    c. Third, the defendant knew the importer's or manufacturer's serial number had been removed, obliterated, or altered; and

    d. Fourth, the firearm had been shipped or traveled in interstate or foreign commerce.

10. I know based on my training and experience and conversations with other law enforcement officers that the elements of a violation of 26 U.S.C. § 5861(d) (possession of an unregistered short-barreled shotgun and/or silencer) are as follows:

    a. First, the subject knowingly possessed a firearm;

    b. Second, the subject was aware that the firearm was either a short-barreled shotgun with a barrel of less than 18 inches in length or a silencer; and

    c. Third, the subject had not registered the firearm with the National Firearms Registration and Transfer Record.

11. The information set forth in this affidavit is not intended to detail each and every fact and circumstance of the investigation or all the information known to me and other law enforcement investigators.  Rather, this affidavit serves to establish probable cause for the arrest of MAHONEY, ALVAREZ, KILLOUGH, and CASPERS for violations of the above-described federal statutes.

12. This affidavit is based not only upon my own personal knowledge but also the knowledge of other law enforcement officers involved in this investigation. Where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance,

and relevant part.  Similarly, where I describe in this affidavit information contained in reports and other documents or records, this information is also described in sum, substance, and relevant part.

## Investigation Background

### *The Vallejo HAMC is a Criminal Enterprise*

13. Law enforcement is currently investigating the Vallejo HAMC's criminal-enterprise activities.  The Vallejo HAMC is a criminal enterprise based in the Eastern District of California with a long, documented history of racketeering activities and violence, ranging from assaults to murder.  There have also been documented instances of drug trafficking, illegal firearm possession, and related crimes.

14. The following are a sampling of notable incidents/arrests which were conducted by, or on behalf of, Vallejo HAMC members and/or their associates, including incidents directly involving three of the four specific subjects for whom the government seeks complaints and arrest warrants in this affidavit—MAHONEY, ALVAREZ, and KILLOUGH.

    a. 2013 – Vallejo HAMC member Dennis KILLOUGH and his wife at the time (Sarah Barham Killough) were arrested following an investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  During that investigation, KILLOUGH sold stolen military equipment and an AR-15 rifle to undercover ATF agents.  KILLOUGH was arrested on charges of felon in possession of a firearm, sale of an assault weapon, being armed with a firearm during a controlled substance offense, and transportation of methamphetamine for sale.  A search warrant was also served at the Vallejo HAMC clubhouse, and—during that search—law enforcement seized a handgun.  Law enforcement also seized a "sawed off" shotgun from a storage facility located in Vacaville, which was rented by KILLOUGH.

    b. 2019 – Vallejo HAMC member Jaime ALVAREZ was contacted during a traffic stop, where he was arrested for felon in possession of a firearm by American Canyon Police Department.  At the time of police contact, ALVAREZ was wearing his Hells Angels 3-piece "cut" and was also found to be in possession of a cell phone with a Hells Angels sticker on the back, Hells Angels patches, and a notebook with a Hells Angels sticker located on the front.  A subsequent search warrant at ALVAREZ's residence revealed an unloaded, 12-gauge shotgun in the master bedroom, additional ammunition in a safe, and miscellaneous Hells Angels "81 support gear."  The number "81" corresponds to the letters "HA" for Hells Angels because "H," is the eighth letter of the alphabet and "A" is the first.  ALVAREZ admitted to being a member of the Vallejo HAMC.

c. 2021 – Solano County Sheriff's Deputies were dispatched to Judy's Wild Wrangler Saloon at 4823 Midway Road in Vacaville.  The call was for a physical altercation.  The victim was reportedly assaulted/ knocked unconscious by a patched member of the Hells Angels, believed to be Michael MAHONEY.  Law enforcement has reviewed video of the assault and confirmed that the attack was carried out by Michael MAHONEY, a member of the Vallejo HAMC.  At the time of the assault, MAHONEY was wearing his full Hells Angels three-piece "cut," and responding deputies were advised to be on the lookout for approximately 5 to 10 Hells Angels members, who were believed to still be in the area.  Before Solano County deputies could arrive at the bar, all parties fled the scene.

d. Below are still images taken from video surveillance at the bar. Interestingly, in the video still images, MAHONEY is seen wearing a Hells Angels vest with the words "Yolo County" in the bottom right corner of the vest.  Based on this incident and additional intelligence gathered by this investigation, I believe the Vallejo HAMC is or was attempting to expand its reach into the contested area of Yolo County. Historically, Yolo County has been claimed as the turf of various motorcycle clubs, including the Vagos and Mongols—both direct rivals of the Hells Angels and the Vallejo HAMC.







15. To perpetuate the enterprise and to maintain and extend its power, Vallejo HAMC members and associates engage in a pattern of racketeering predicates, including committing and conspiring to commit murder, attempted murder, intimidation, and assault resulting in great bodily injury against individuals who pose a threat to the enterprise or who jeopardize its operations. These targets include members of rival organizations, members of motorcycle clubs who are inferior or "puppet" clubs to the Vallejo HAMC, and witnesses to the enterprise's illegal activities. The enterprise's criminal acts pose a threat of continued criminal activity because

they have continued through the recent beating of Victim-1, as discussed in the next section.

### *Members of the Vallejo HAMC Criminal Enterprise Were Involved in the Brutal Beating of Victim-1 in October 2021*

16. Victim-1 has been a union iron worker for approximately the past 16 years.  For approximately the past 12 years, Victim-1 has been a member of the Union Iron Workers Motorcycle Club ("UIWMC"), which Victim-1 describes as a nationwide family motorcycle club.

17. On October 13, 2021, the UIWMC president instructed Victim-1, along with approximately 8 other UIWMC members, to go to the Vallejo HAMC clubhouse to speak with the Vallejo HAMC.  The UIWMC members planned to meet at a nearby bar (Gentleman Jim's) and ride over to the Vallejo HAMC clubhouse together.

18. Victim-1 decided to go to the Vallejo HAMC clubhouse early by himself to talk with members of the Vallejo HAMC.  Victim-1 wanted to arrive early in order to explain why he did not go on a recent motorcycle ride with the Vallejo HAMC.

19. Victim-1 arrived at the Vallejo HAMC clubhouse at approximately 6:30 p.m.  Victim-1 identified 1801 El Dorado Street as the address of the HAMC clubhouse in Vallejo that he reported to on the evening of October 13.

20. When Victim-1 arrived at the clubhouse, members of the Vallejo HAMC tried to convince him to come inside.  Victim-1 felt uneasy and said he didn't feel comfortable going inside.  Three members of the Vallejo HAMC then surrounded Victim-1.  At that moment, MAHONEY choked Victim-1 and physically forced Victim-1 into the Vallejo HAMC clubhouse.

21. Once inside the Vallejo HAMC clubhouse, Victim-1 saw a total of 12 officers and members of the Vallejo HAMC.  They sat Victim-1 down in a metal chair with a white vinyl padded seat.  They began severely beating Victim-1 over the course of the next 1 hour and 50 minutes.

22. Victim-1 provided the estimate of his beating because he kept track of the time using a clock positioned in front of where he was placed on the chair.  Victim-1's chair was approximately 15 feet from a roll up door towards the back of the clubhouse.  The clock was across the room positioned above a bar within the clubhouse.

23. As relevant to the present affidavit, Victim-1 identified the following HAMC members as being present and participating in the gang beating (among others):



    a.  Michael MAHONEY, the enforcer for the Vallejo HAMC, participated in the physical assault of Victim-1.  Victim-1 stated that MAHONEY was wearing an HAMC t-shirt, tennis shoes, and a red-colored HAMC hat.



    b.  Jaime ALVAREZ – a member of the Vallejo HAMC, who also participated in the beating of Victim-1 on October 13.  According to Victim-1, ALVAREZ had a mustache and was wearing his black HAMC vest and a ball cap.



c.  Dennis KILLOUGH – member of the Vallejo HAMC.  KILLOUGH
repeatedly punched Victim-1 in the same spot on his ribs.  During the
beating, KILLOUGH would approach Victim-1 from behind, while
Victim-1 was seated in a chair, and continue punching Victim-1 in the
ribs.  Victim-1 felt his ribs crack from the punches that KILLOUGH
delivered.  KILLOUGH was wearing a black HAMC shirt and has longer
hair than depicted in his CA DMV photograph.



d.  Kenneth CASPERS, aka "KJ," – member of the Vallejo HAMC.  During
the attack, CASPERS grabbed a mop from behind the bar in the clubhouse
and mopped up blood on the ground coming from Victim-1.  CASPERS
was wearing a white shirt with HAMC markings on it. Victim-1 stated that

       CASPERS walked through Victim-1's blood as he was mopping.
       CASPERS also participated in the beating of Victim-1.

24. While the assault was occurring, members of the Vallejo HAMC wanted to know who Victim-1 had been talking with at a UIWMC meeting on October 10, 2021. The Vallejo HAMC members said they had a recording of Victim-1 talking to another UIWMC member. The Vallejo HAMC members said that—in the recording—Victim-1 and another UIWMC member were talking about communicating with rival motorcycle gangs. They told Victim-1 that if he named the other person, they would stop beating him. Victim-1 then told the Vallejo HAMC that he had been talking with another person, identified here as Victim-2. Despite providing this information, members of the Vallejo HAMC continued to beat Victim-1.

25. The Vallejo HAMC president instructed MAHONEY to call Victim-2 immediately and get him into the clubhouse. Consistent with this directive, MAHONEY called Victim-2 and ordered him to the Vallejo HAMC clubhouse. When Victim-2 arrived at the Vallejo HAMC clubhouse on October 13, he attempted to flee because he saw what was going to happen to him.

26. Before he could get away, members of the Vallejo HAMC punched Victim-2 and dragged him in a semi-conscious state to another chair within the clubhouse that was similar to Victim-1's.

27. Victim-2's chair was set up across the room from Victim-1, closer to the bar. The Vallejo HAMC president asked Victim-2, "Haven't I been good to you?" Then, the Vallejo HAMC members began beating Victim-2. In all, Victim-1 estimated that Victim-2 was knocked unconscious three times. Victim-1 noted that Victim-2 was a smaller male and could not absorb the punches well.

28. After the beatings ended but before Victim-1 had departed the HAMC clubhouse on October 13, 2021, the Vallejo HAMC president threatened to kill Victim-1 if he ever saw him in Vallejo again. On the same night prior to Victim-1 departing the clubhouse, MAHONEY told Victim-1 that if Victim-1 retaliates, he knows where Victim-1 lives.

29. Law enforcement was later able to corroborate the extent of Victim-1's injuries from the October 13 beating at the Vallejo HAMC clubhouse. In particular, according to Victim-1's medical records from his visit to the Colusa Medical Center on October 15, 2021, Victim-1 sustained multiple fractured ribs, as well as pulmonary and facial contusions. Photographic evidence from the medical records confirms substantial facial swelling and contusions from the beating.

30. It should be noted that after the October 13 attack, an officer from the Vallejo Police Department contacted Victim-2 by telephone on or about October 19, 2021. The officer inquired whether Victim-2 had been the victim of an

assault/crime, after the Vallejo Police Department received a report from Victim-1.  Victim-2 claimed to the officer that he had not been a victim of a crime.

31. Based on my training and experience, however, and based on my investigation in this case, I believe that Victim-2 did not provide the Vallejo Police Department officer with a truthful account about the attack, because he feared further retaliation—including physical harm—from members or associates of the Vallejo HAMC.

32. Indeed, FBI Special Agent Brendan S. Wright and I followed-up with Victim-2, visiting his residence to speak with him.  During this in-person interview, Victim-2 admitted that he had gone to the hospital after the October 13 incident, but he was either unwilling or unable to provide an account of what happened inside the clubhouse due to the injuries he had sustained.

33. For example, Victim-2 stated that had trouble remembering much of anything from that October 13 date.  He reportedly was advised by his roommate that he had been called to go down to the clubhouse and was later advised by another member of the UIWMC that members of the Vallejo HAMC had beaten him up on his arrival.  Moreover, Victim-2's girlfriend expressed great concern about Victim-2's well-being following the assault, stating that his face was bruised and scratched, with blood coming from his ear when he returned home after the assault.  Law enforcement also learned that—after the October 13 assault—Victim-2 displayed great difficult speaking and recalling events, as he regularly called his girlfriend from the hospital to ask her why he was there.

### Law Enforcement Obtains Federal Search Warrants for Properties Belonging to MAHONEY, ALVAREZ, and KILLOUGH

34. Based on these and other facts, FBI SA Wright submitted an affidavit in support of search warrants and arrest warrants concerning properties belonging to—among other individuals—MAHONEY, ALVAREZ, KILLOUGH, and CASPERS.

35. These requested warrants were reviewed and approved by the Honorable Deborah Barnes on December 6, 2021.  *See, e.g.*, Case Nos. 2:21-sw-00906-DB (MAHONEY); 2:21-sw-0913-DB (ALVAREZ); 2:21-sw-0910-DB (KILLOUGH); 2:21-sw-0917-DB (CASPERS).

36. On December 8, 2021, law enforcement agents executed these and other warrants at properties belonging to members of the Vallejo HAMC, including properties belonging to MAHONEY, ALVAREZ, KILLOUGH, and CASPERS.  The items found relevant to these individuals and the present affidavit are described in more detail in the sections below.

**Probable Cause for Complaints and Arrest Warrants**

*Michael MAHONEY*



37. I am submitting this affidavit in support of a request for the issuance of a criminal complaint and arrest warrant against Michael MAHONEY for violating 18 U.S.C. § 922(k) (possession of a firearm with an obliterated serial number) and for two violations of 26 U.S.C. § 5861(d) (possession of an unregistered short-barreled shotgun and possession of an unregistered silencer). The facts establishing probable cause that MAHONEY committed these crimes are set forth below.

38. On December 8, 2021, law enforcement agents executed a federal search warrant at MAHONEY's known residence: 395 Marigold Drive, Fairfield, California, which is within the Eastern District of California. Within the home's garage, officers located several items of evidentiary value, including:

    a. An unregistered American Tactical rifle (s/n NS171270) with a pistol grip, a detachable magazine, an adjustable stock, and a loaded 40-round magazine, which I know based on my training and experience makes the firearm an assault weapon under California law. This rifle was found in a gun safe in the garage;

    b. An unregistered Sears & Roebuck short-barreled (or "sawed-off") 12-gauge shotgun (s/n 67659). This shotgun was found in a rifle bag in the garage. The finding officer noted that the barrel appeared to be cut off and was shorter than its factory state. The barrel measured approximately 12.5 inches, and the overall length of the shotgun was approximately 25.75 inches. I know based on my training and experience that a California-compliant shotgun would have a barrel that is at least 18 inches long and would be at least 26 inches in length, in total;

    c. A Smith & Wesson .38 caliber revolver with the serial number obliterated, which was found in the garage gun safe;

    d. An unregistered Intratec Tec-9 9mm pistol (s/n 125732) with a high-capacity magazine loaded with 29 rounds of ammunition, which was found in the garage gun safe.

    e. Two firearm suppressors or "silencers," which were located in the garage gun safe;

    f. A leather "sap" or billy club (which had the Hells Angels Deathhead logo as well as a 1% diamond and other HAMC symbols located on it) was located in the garage gun safe;

g.   Numerous high-capacity magazines were found in the garage gun safe; and

h.   1.1 grams of suspected crack cocaine were also found in the garage gun safe.

39. After law enforcement officers located these items in the garage, they asked MAHONEY about the safe and its contents after providing him his *Miranda* warnings.  MAHONEY said that "it's all mine," although he did not discuss further details about the weapons or other items located inside the garage.

40. When asked by law enforcement why the gun safe was found unlocked, MAHONEY was unable to provide an obvious reason or explanation.  Instead, he simply stated that it just was.  When confronted with the fact that his 3-year-old daughter could have had access to the safe and the weapons inside, MAHONEY was adamant that his daughter was unable to open doors and therefore would be unable to make entry into the garage or access the gun safe.  MAHONEY also denied that his wife, Teairra Trowell, had access to the gun safe.  Instead, he claimed full responsibility for the safe's contents.

41. MAHONEY did not provide any information regarding his association, membership, or history with the Hells Angels.  However, when asked directly if he was a member of the HAMC, MAHONEY replied that it was obvious.

42. After being advised of her *Miranda* warnings, Trowell answered the searching officers' questions.  She appeared to be unwilling or unable to provide any information to the officers regarding the gun safe in the garage or MAHONEY's status as a member of the Vallejo HAMC.

43. Based on my training, experience, and consultation with an ATF interstate nexus expert, I know that the Smith & Wesson .38 caliber revolver referenced above was manufactured outside the state of California.  Accordingly, this firearm necessarily traveled in interstate commerce prior to being possessed on December 8, 2021 in the Eastern District of California.

44. Below is a photograph of the above-described Smith & Wesson, which shows that the serial number along the barrel has been scratched off or obliterated.  In fact, looking closely at the scratched off serial number, one can slightly make out the numbers/digits, which suggests that anyone handling this firearm would know that its serial number has been tampered with:



45. I have also consulted with an ATF firearms expert concerning the short-barreled
    firearm that was found at MAHONEY's residence—namely, the Sears &
    Roebuck short-barreled 12-gauge shotgun (s/n 67659).  This expert noted that this
    shotgun was originally manufactured as a shotgun with a barrel length of more
    than 18 inches by Winchester (located in Connecticut).  The expert noted that the
    shotgun had a smooth bore barrel that had been modified by cutting at the muzzle
    end.  The expert also noted that the wooden shoulder stock had been removed
    rearward from the grip portion of the stock, meaning the shotgun as modified was
    no longer meant to be fired from the shoulder.  The expert conducted a
    measurement of the sawed-off barrel, finding that it was approximately 12-7/8
    inches.  The expert also measured the entire firearm, finding that its overall length
    as modified was approximately 25-3/4 inches.  Based on this examination, the
    expert determined that the shotgun found in MAHONEY's residence was a
    "firearm" within the meaning of 26 U.S.C. § 5845(a)(2).

46. Below are photographs of the above-described sawed-off shotgun, which was
    recovered from MAHONEY's residence, and which plainly had been modified to
    violate the minimum-length requirements established by federal law:





 

47. "It is common knowledge that the primary purpose of shortening a shotgun or a rifle under the permitted length is to make it concealable and thus effective in the commission of serious crimes such as bank robbery, murder, drug trafficking, and gang violence. The same purpose attaches also to the obliteration of serial numbers on handguns:  The act of obliteration makes them harder to trace." *United States v. Mack*, 164 F.3d 467, 472 (9th Cir. 1999).

48. I have also consulted with an ATF firearms expert concerning one of the above-described silencers that was found in the gun safe in MAHONEY's garage.  This firearms expert examined this silencer and determined that the silencer did not contain any manufacturer's markings or serial number, and—as such—the silencer could not be properly registered to MAHONEY (or anyone else). Moreover, this examination determined that the silencer was a "firearm silencer" within the meaning of 18 U.S.C. §§ 921(a)(3) and 921(a)(24).

49. Below are pictures of the firearm silencer that was located in the gun safe in MAHONEY's garage and that was examined by the ATF firearms expert:



50. Following the December 8, 2021 search, state law enforcement officers arrested MAHONEY on numerus charges, including violations of California Penal Code §§ 30605(a) (possession of an assault weapon), 33215 (possession of a short-barreled rifle), 23900 (altered/removed firearm serial number), 33410 (possession of a silencer), and California Health & Safety Code § 11370.1 (possession of a controlled substance while armed).  MAHONEY is not currently in custody.

### *Jaime ALVAREZ*



51. I am submitting this affidavit in support of a request for the issuance of a criminal complaint and arrest warrant against Jaime ALVAREZ for violating 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).  The facts establishing probable cause that ALVAREZ committed this crime are set forth below.

52. ALVAREZ has been convicted of several felonies, including the following:

   a.  1993 – Felony possession of dangerous weapon (California Penal Code § 12020(a)); and

   b.  2007 – Felony vehicle theft (California Vehicle Code § 10851(a)).

53. On December 8, 2021, law enforcement agents executed a federal search warrant at ALVAREZ's known residence:  88 Calhoun Street, Vallejo, California, which is within the Eastern District of California.  Within the home, officers located several items of evidentiary value, including 8 firearms:

a. A Ruger LC380 (s/n 323-91883) was located in an unlocked filing cabinet in the garage.  This firearm was determined to be registered to Harriet Greenwood (aka Alvarez).

b. A Smith & Wesson Model 66 .357 magnum revolver (s/n 50K3665) was found in a drawer in a bedside stand.  This firearm was determined to be registered to Harriet Greenwood (aka Alvarez).

c. A Glock 27 .40 SW caliber handgun (s/n XPX016) was found in another bedside stand alongside a wallet which contained ALVAREZ's California driver's license.  The dealer record of sale for this firearm showed a sale to Dion Tulk.

d. A Dickinson Commando 12-gauge shotgun (s/n 163114191) was found on a shelf above clothing that appeared to belong to ALVAREZ.  This firearm was determined to be registered to Harriet Greenwood (aka Alvarez).

e. A Beretta Tomcat .32 ACP handgun (s/n DAA003876CA) was located in a purse hanging on the back of the master bedroom door.  This firearm was determined to be registered to Harriet Greenwood (aka Alvarez).

f. An un-serialized AR-15-style rifle with a barrel length of approximately 10 inches was located in a black duffel bag in a small, locked closet in a room directly across from the master bedroom.  The key to this closet was located in the master bedroom closet.

g. An AK-47-style rifle (s/n 101692) was located in this same black duffel bag in the small, locked closet in the room directly across from the master bedroom.  Law enforcement could not locate any dealer record of sale for this firearm.

h. A Harrington and Richardson single-shot, 12-gauge shotgun (s/n AX637423) was located in this same black duffel bag in the small, locked closet in the room directly across from the master bedroom.  Law enforcement could not locate any dealer record of sale for this firearm.

i. Law enforcement located numerous live rounds associated with the above-listed firearms.

j. Law enforcement also located a bulletproof vest from what appeared to be ALVAREZ's side of the master bedroom closet.

54. Law enforcement officers read Harriet Greenwood (aka Alvarez) her *Miranda* warnings, and she agreed to answer the officers' questions.  She confirmed that

17

she has been married to ALVAREZ for about a year, and that they both live at the 88 Calhoun Street address.  She also confirmed that ALVAREZ is a member of the Vallejo HAMC.  Greenwood (aka Alvarez) stated that she had never seen ALVAREZ in possession of the firearms that were registered to her.  However, she also claimed to know nothing about the Glock 27 found in the bedstand with ALVAREZ's driver's license, and she said that she did not know anything about the three firearms located in the black duffel bag inside the locked bedroom closet.  She stated that she had never seen ALVAREZ with any of those firearms.  Finally, she stated that she was unaware of the body armor that was hanging on ALVAREZ's side of the closet.

55. Based on my training, experience, and consultation with an ATF interstate nexus expert, I know that the Glock 27 .40 SW caliber handgun (s/n XPX016) firearm referenced above was manufactured outside the state of California.  Accordingly, this firearm necessarily traveled in interstate commerce prior to being possessed on December 8, 2021 in the Eastern District of California.

56. Below is a photograph of the above-described Glock 27 that was recovered from ALVAREZ's residence near his driver's license:



57. Following the December 8, 2021 search, state law enforcement officers arrested ALVAREZ based on several charges, including:  California Penal Code §§ 29800(a)(1) (possession/etc. of a firearm by a felon/addict); 33215 (possession of a short-barreled rifle); 31360(a) (possession of body armor by a violent felon);

and 30305(a)(1) (possession of ammunition by a prohibited person).  ALVAREZ is not currently in custody.

### Dennis KILLOUGH



58. I am submitting this affidavit in support of a request for the issuance of a criminal complaint and arrest warrant against Dennis KILLOUGH for two violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).  The facts establishing probable cause that KILLOUGH committed this crime are set forth below.

59. KILLOUGH has been convicted of the following felonies:

   a. 1993 – Possess/manufacture/sell a dangerous weapon/etc. (California Penal Code § 12020(a));

   b. 1993 & 2001 – Possession of a controlled substance (California Health & Safety Code § 11377(a));

   c. 1994 – Possess controlled substance in prison/etc. (California Penal Code § 4573.6);

   d. 2010 – Burglary (California Penal Code § 459);

   e. 2014 – Manufacture/sell/transport/etc. an assault weapon (California Penal Code § 30600(a));

   f. 2014 – Felon in possession of a firearm (California Penal Code § 29800(a)(1)); and

   g. 2014 – Transport/sell controlled substance (California Health & Safety Code § 11379(b)).

60. On December 8, 2021, law enforcement agents executed a federal search warrant at KILLOUGH's known residence:  368 Adobe Drive, Vacaville, California, which is within the Eastern District of California.  Within the home, officers located several items of evidentiary value, including 2 firearms:

   a. A Taurus G2C 9mm compact pistol with an obliterated serial number was found in the master bedroom closet inside a green camouflage nylon pistol case.  The firearm had a magazine inserted in the magazine well that was loaded with 12 live 9mm full metal jacket rounds of ammunition.

   b. A Taurus handgun, model PT 745 Pro (s/n NEU99859) was located in the master bedroom closet.  The handgun had a magazine loaded with 6 live full metal jacket rounds of .45 ACP ammunition in the magazine well.  Beside this handgun was a second .45 ACP magazine that was also loaded

with 6 live rounds of .45 ACP full metal jacket ammunition.  Below the handgun and magazine were two clear plastic bags containing live ammunition, including 14 live rounds of full metal jacket .380 ACP ammunition and 80 live rounds of .45 ACP full metal jacket ammunition.

c. 2 bottles of NANDROLONE DECANOATE—a schedule III anabolic steroid—and several hypodermic needles were located in the master bedroom closet.  The steroid and needles were in a plastic bag, along with a shipping order for the needles that was addressed to KILLOUGH.

d. Numerous HAMC paraphernalia and indicia were found in the master bedroom closet, including an HAMC jacket with a "Vallejo" tab, and KILLOUGH's charter of membership/affiliation.

61. During this search, KILLOUGH's wife, Shayna Loncaric, attempted to claim ownership of the firearms found during the search, telling the officers that she had gotten the firearms "on the street."  However, Loncaric was unable to provide the searching officers with any information concerning where the firearms were purchased, how many there were, what type of firearms they were, or even what they looked like.  Moreover, when officers asked where the firearms were stored inside the residence, Loncaric could state only that they were "possibly" in the closet.

62. Law enforcement then told Loncaric that—based on her answers—they doubted that she had any connection to the firearms that law enforcement had located.  In response, Loncaric shrugged her shoulders and told the officers to call KILLOUGH, and she provided the officers with KILLOUGH's cell phone number.  Loncaric also told police officers that she and KILLOUGH stay in the master bedroom, which is where the above-described items were found.

63. Based on my training, experience, and consultation with an ATF interstate nexus expert, I know that the Taurus G2C 9mm compact pistol with an obliterated serial number and the Taurus handgun, model PT 745 Pro (s/n NEU99859), both of which are referenced above, were manufactured outside the state of California.  Accordingly, these two firearms necessarily traveled in interstate commerce prior to being possessed on December 8, 2021 in the Eastern District of California.

64. The Taurus G2C 9mm compact pistol with an obliterated serial number described above is pictured below.  In the photograph, you can see that there is obvious discoloration on the black backslide of the firearm, which is where the serial number is supposed to be located, and which suggests that anyone handling this firearm would notice the obliterated serial number:



65. The Taurus handgun, model PT 745 Pro described above is pictured below:



66. KILLOUGH was not present at his residence during the December 8, 2021 search.  However, on December 9, 2021, KILLOUGH was arrested by officers with the Vacaville Police Department based on a state arrest warrant issued as a result of the items found in KILLOUGH's home.  Specifically, officers arrested KILLOUGH for violating California Penal Code § 29800(a)(1) (felon/etc. in possession of a firearm).  KILLOUGH is not currently in custody.

### Kenneth CASPERS



67. I am submitting this affidavit in support of a request for the issuance of a criminal complaint and arrest warrant against Kenneth CASPERS for violating 18 U.S.C. § 922(g)(1) (felon in possession of ammunition) and 26 U.S.C. § 5861(d) (possession of an unregistered silencer).  The facts establishing probable cause that CASPERS committed these crimes are set forth below.

68. CASPERS has been convicted of the following felonies:

   a. 1991 – Manufacturing controlled substances (California Health & Safety Code § 11379.6(a));

   b. 1994 –  Felon in possession of a firearm (California Penal Code § 12021(a)(1)); and

   c.  2012 – Possession of controlled substance (California Health & Safety Code § 11377(a)).

69. On December 8, 2021, law enforcement agents executed a federal search warrant at CASPERS's known residence:  931 Mustang Circle, Vacaville, California, which is within the Eastern District of California.  Within the home, officers located several items of evidentiary value, including:

   a. 423 rounds of ammunition located in the garage near CASPERS' motorcycle;

   b. A Glock 21 .45 caliber revolver (s/n MHK535) located in the garage;

   c. An Ubert .45 long caliber revolver (s/n UG3260) located in the garage;

   d. A Ruger 10/22 .22 caliber rifle (s/n 824-18821) located in the garage;

   e. A Benelli Super Nova 12-gauge shotgun (s/n Z650526V) located in the garage;

   f. A Marlin Firearms Model X-7 30-06 caliber rifle (s/n MM015325) located in the garage;

g. A Raven Arms P-25 .25 caliber pistol (s/n 011418) located in the master bathroom;

h. A Hopkins and Allen Arms XL 22 caliber revolver (s/n 9410) located in a nightstand in the master bedroom;

i. 18 rounds of ammunition that were loaded inside the above-described Raven Arms pistol and Hopkin and Allen Arms revolver;

j. 626 rounds of .45 caliber ammunition located in the living room of the residence;

k. A black silencer with no serial number located inside a shipping envelope with CASPERS' name on it in the master bedroom closet; and

l. Various items of clothing, patches, and other indicia of CASPERS' Vallejo HAMC membership.

70. During the search, law enforcement was able to determine that the master bedroom (where several of the items of evidentiary value were discovered) belonged to CASPERS.  For example, the master bedroom closet was full of HAMC clothing and paraphernalia.  Moreover, CASPERS' cell phone was located in the master bedroom.

71. During the search, law enforcement agents interviewed CASPERS after informing him that he was not in custody and advising him several times that he was free to leave.  CASPERS nevertheless spoke with the searching agents.  He told the officers that he had no knowledge of the beating that occurred on October 13, 2021, that he did not know Victim-1, and that no violent acts like the incident described above have ever occurred at the Vallejo HAMC clubhouse.

72. Law enforcement also spoke to CASPERS' adult son, Kenneth Caspers III. Caspers III was detained at the beginning of the search but was released prior to being interviewed.  Law enforcement informed Caspers' III that he was free to leave and was under no obligation to divulge information or cooperate with the investigation.  Caspers III nevertheless agreed to speak with law enforcement.  He told the agents that the firearms found in the garage belonged to him, and that he recently moved back home from Louisiana.  However, he told law enforcement that he does not have a bedroom in CASPERS' home.

73. Later Caspers III filed a claim form seeking the return of all of the firearms and ammunition that were seized from CASPERS residence on December 8, 2021. This claim included not just the firearms and the ammunition that were located in the garage (and for which Caspers III claimed ownership on December 8, 2021), but also the two firearms found in the master bedroom and the ammunition found

in the master bedroom and living room.  As to the two firearms located in the master bedroom (the Raven Arms pistol and the Hopkins and Allen revolver), Caspers III did not appear to claim ownership; instead, he claimed that these belonged to his mother (Debbie Ann Caspers), and that they had been handed down to her from CASPERS' father (Kenneth Ellwood Caspers Sr.).

74. An ATF firearms expert later conducted an examination of the silencer recovered from the master bedroom of CASPERS' home.  This examination determined that this silencer did not contain any manufacturer's markings or serial number, and—as such—the silencer could not be properly registered to CASPERS (or anyone else).  Moreover, this examination determined that the silencer was a "firearm silencer" within the meaning of 18 U.S.C. §§ 921(a)(3) and 921(a)(24).

75. Below is a picture of the firearm silencer (in its disassembled state) that was located in the master bedroom closet of CASPERS' home inside an envelope with a shipping label reflecting CASPERS' name:



76. An ATF interstate nexus expert also examined three rounds of ammunition that had been recovered from the master bedroom of CASPERS' home.  These three rounds were from the 18 rounds described above that had been found loaded inside the Hopkins and Allen and Raven firearms, and they were representative samples of the three kinds of ammunition that made up these 18 rounds.  The nexus expert was able to confirm that—based on the headstamps and other markings on these three rounds of ammunition—each of the three rounds of ammunition was manufactured outside of California.  As a result, these rounds of ammunition necessarily traveled in interstate commerce before they were found in CASPERS' residence in the Eastern District of California.

77. Below are photographs of the three rounds of ammunition analyzed by the ATF interstate nexus expert:



78. CASPERS is not currently in custody, because state law enforcement has not yet charged CASPERS with a crime.

**Conclusion**

79. Based upon the information set forth in this affidavit, I submit that there is probable cause to believe that:

    a.  Michael MAHONEY possessed:

        i.  The above-described Smith & Wesson .38 caliber revolver with an obliterated serial number on December 8, 2021, in the Eastern District of California in violation of 18 U.S.C. § 922(k) (possession of a firearm with an obliterated serial number);

        ii.  The above-described Sears & Roebuck short-barreled shotgun (s/n 67659) on December 8, 2021, in the Eastern District of California in violation of 26 U.S.C. § 5861(d) (possession of an unregistered short-barreled shotgun); and

        iii.  The above-described silencer on December 8, 2021, in the Eastern District of California in violation of 26 U.S.C. § 5861(d) (possession of an unregistered silencer).

    b.  Jaime ALVAREZ possessed the above-described Glock 27 .40 SW caliber handgun (s/n XPX016) on December 8, 2021, in the Eastern District of California in violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).

    c.  Dennis KILLOUGH possessed:

        i.  The above-described Taurus G2C 9mm compact pistol with an obliterated serial number on December 8, 2021, in the Eastern

District of California in violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm); and

    ii.  The above-described Taurus handgun, model PT 745 Pro (s/n NEU99859) on December 8, 2021, in the Eastern District of California in violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm).

  d.  Kenneth CASPERS possessed:

    i.  The above-described ammunition on December 8, 2021, in the Eastern District of California, in violation of 18 U.S.C. § 922(g)(1) (felon in possession of ammunition); and

    ii.  The above-described silencer on December 8, 2021, in the Eastern District of California, in violation of 26 U.S.C. § 5861(d) (possession of an unregistered silencer).

80. Accordingly, based upon the foregoing, I respectfully request that the Court authorize the requested criminal complaints and issue the requested arrest warrants.

[NOTHING FOLLOWS ON THIS PAGE]

81. I further request that the Court order that all papers in support of this application, including the affidavit, complaint, and arrest warrants be sealed until further order of the Court.  These documents discuss aspects of an ongoing federal criminal investigation that are neither public nor known to MAHONEY, ALVAREZ, KILLOUGH, and CASPERS.  Premature disclosure might cause these individuals to flee and could endanger the safety of the arresting officers.  Accordingly, there is good cause to seal these documents until MAHONEY, ALVAREZ, KILLOUGH, and CASPERS are in federal custody.  I further request that the Court authorize the sharing of the complaints, affidavits, and arrest warrants with state law enforcement officers and prosecutors for coordination purposes.

I swear, under penalty of perjury, that the foregoing is true and correct, to the best of my knowledge, information and belief.

_/s/Shane Raftery_____
SHANE RAFTERY
Task Force Officer, Federal Bureau of Investigation

Subscribed and sworn to me telephonically
this __11__ day of May 2022

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

/s/ _Aaron D. Pennekamp_
Aaron D. Pennekamp
Assistant United States Attorney